J-S08015-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: S.K., JR., A MINOR | : IN THE SUPERIOR COURT OF |
| | :        PENNSYLVANIA |
| | : |
| APPEAL OF: R.S., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 1495 MDA 2021 |

Appeal from the Decree Entered October 20, 2021
In the Court of Common Pleas of Mifflin County Orphans' Court at No(s):
2021-00032

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.:                    **FILED APRIL 01, 2022**

R.S. ("Mother") appeals from the decree entered on October 20, 2021, which involuntarily terminated her parental rights to S.K., Jr., her minor son, born in February 2020.[1]  We affirm the decree.

We summarize the relevant facts and procedural history as follows. When S.K., Jr. was born, hospital staff reported to the Mifflin County Children and Youth Agency ("Agency") that Mother was exhibiting symptoms of unstable mental health.[2]  N.T., 10/4/21, at Exhibit P-2.  Specifically, the

_____

[1] The orphans' court also terminated the parental rights of the father of S.K., Jr., S.K., Sr. ("Father").  Father has neither filed his own appeal nor participated in Mother's appeal.

[2] The Agency already had an open dependency case involving a half-sibling of S.K., Jr., who was born in 2018.  N.T., 10/4/21, at Exhibit P-2.  Ultimately, Mother voluntarily terminated her parental rights to this child in a separate proceeding.  *Id*. at 121.

Agency had concerns regarding Mother's intellectual disability, "extensive mental health history," past drug use, and the open dependency case with S.K., Jr.'s half-sibling. *Id*. at 6; *id*. at Exhibit P-2. Mother was in a relationship with Father, who had his own mental health struggles. Additionally, Father had been convicted of child pornography possession ten years before and did not have custody of his four other children, including one to whom his parental rights had been terminated in 2012. *Id*. at 6; *id*. at Exhibit P-2.

Based on the foregoing concerns, the Agency obtained emergency custody of S.K., Jr. on February 27, 2020. It then filed a petition to adjudicate S.K., Jr. dependent. *Id*. at Exhibit P-2. On March 12, 2020, the juvenile court adjudicated S.K., Jr. dependent pursuant to 42 Pa.C.S. § 6302(1) of the Juvenile Act. *Id*.

The Agency placed S.K., Jr. in foster care and developed goals for Mother to complete to reunify with S.K., Jr.[3] *Id*. at 8. These goals did not change throughout the dependency case and included ensuring that Mother: (1) satisfied the emotional, physical, and developmental needs of S.K., Jr.; (2) participated in mental health treatment; (3) maintained a lifestyle conducive to parenting S.K., Jr. in her home; (4) avoided criminal activity; and (5) cooperated with the Agency and its service providers. *Id*. at 8-9.

---

[3] Foster parents are a pre-adoptive resource for S.K., Jr. N.T., 10/4/21, at 32.

- 2 -

After Mother failed to make sufficient progress toward reunification, on July 12, 2021, the Agency filed a petition seeking to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The orphans' court appointed Mark J. Remy, Esquire, to represent S.K., Jr. as legal counsel in accordance with 23 Pa.C.S. § 2313(a), as well as Erica Shoaf, Esquire, as guardian *ad litem*. It also appointed Tammy S. Dusharm, Esquire, to represent Mother.

The orphans' court conducted a termination hearing on October 4, 2021, when S.K., Jr. was twenty months old. The Agency presented the testimony of its caseworker, Brenda Dobson, as well as the testimony of Emma Steininger, a reunification counselor with Family Intervention Crisis Services ("FICS"), a service provider that had been supplying various services to Mother since shortly after the court adjudicated S.K., Jr. dependent. The Agency also introduced various exhibits, including orders related to the dependency matter. Mother testified in opposition to the petition and presented the testimony of her brother. The orphans' court took the decision under advisement. On October 20, 2021, the orphans' court entered the decree involuntarily terminating the parental rights of Mother.

Mother timely filed a notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2). The orphans' court issued a Rule 1925(a) opinion addressing Mother's claims. Mother sets forth two issues for our consideration, which we reverse for ease of disposition:

1. Did the [orphans'] court err in finding that the Agency had established by clear and convincing evidence that Mother will be unable to remedy the conditions that predicated placement of [S.K., Jr.] and caused her incapacity?

2. Did the [orphans'] court err in finding that the [A]gency had established by clear and convincing evidence that termination of Mother's parental rights was in the best interest of [S.K., Jr.] and would serve the needs and welfare of [S.K., Jr.]?

Mother's brief at 5.

We review these issues mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-

will." *Id*. at 826.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra*, at 1123-24.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *In re Adoption of C.M.*, *supra*, at 358.  Termination of parental rights has "significant and permanent consequences for both the parent and child." *In re Adoption of L.A.K.*, *supra*, at 591.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.M.*, *supra*, at 359 (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act.  Subsection 2511(a) sets forth eleven enumerated grounds describing parental conduct warranting involuntary termination.  *See* 23 Pa.C.S. § 2511(a)(1)-(11).  In evaluating whether the petitioner proved grounds under § 2511(a), the orphans' court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa.Super. 2021).  If the orphans' court determines the

petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the orphans' court relied upon subsections 2511(a)(2) and (b),[4] which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

---

[4] The orphans' court also terminated Mother's parental rights pursuant to § 2511(a)(5) and (8). It is axiomatic that the petitioner needs to establish only one § of 2511(a) to proceed to § 2511(b). *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*). Since we affirm the decree pursuant to § 2511(a)(2) and (b), we do not address her arguments concerning § 2511(a)(5) and (8).

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

In her first issue, Mother argues the orphans' court erred by terminating her parental rights pursuant to § 2511(a)(2) because it did not examine her ability to remedy her incapacity. Mother's brief at 19. She believes she would be able to remedy her incapacity and regain custody with Father's support if the Agency afforded her more time. *Id*. at 21-22. Mother emphasizes that she made some progress, *i.e.*, she maintained stable housing for over a year, alleviated a bedbug problem, attended counseling and medication management, remained free of new criminal charges, and produced clean urinalysis screens. *Id*. at 20. Mother acknowledges she has mental health difficulties, but she maintains she has plans for backup care of S.K., Jr. in the event of a mental health crisis. *Id*. at 21.

To prove the existence of grounds pursuant to § 2511(a)(2) by clear and convincing evidence, the following elements must be met:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***Interest of D.R.-W.***, 227 A.3d 905, 912-13 (Pa.Super. 2020) (citation omitted).

Subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for termination under § 2511(a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. *Id*. Thus, sincere efforts to perform parental duties may be insufficient to remedy an incapacity. *In re Z.P.*, *supra*, at 1117.

Instantly, the court's § 2511(a)(2) analysis highlighted the significant concerns about Mother's ability to parent S.K., Jr. and the minimal progress she made in the twenty months since his birth. *See* Orphans' Court Opinion, 10/20/21, at 6-7. The orphans' court noted the testimony that Mother continues to have difficulties following through with her parenting plan. *Id*. It found it significant that even Mother has acknowledged she is unable to parent independently. *Id*. In addition, the court noted Mother's deplorable home conditions have not changed. *Id*. The court acknowledged Mother's attempts to remedy her incapacity but concluded she could not overcome her incapacity to parent within a reasonable time. *Id*.

The certified record supports the assessment of the orphans' court. Mother lived with Father and her mother ("Maternal Grandmother") when S.K., Jr. was born. N.T., 10/4/21, at 13. The home was cluttered and dirty. *Id*. at 9. Relations between Mother and Maternal Grandmother were volatile; Mother called a crisis line three times in one week threatening self-harm and alleging that Maternal Grandmother was violent towards her.[5] *Id*. at 9, 17. Maternal Grandmother kicked Father out, prompting Mother to bounce between Maternal Grandmother's house and stays with random friends and Father. *Id*. at 13.

Mother and Father obtained their own home in July 2020. *Id*. at 13. At first, they kept it clean, but conditions deteriorated. *Id*. at 53. The conditions were exacerbated by the number of animals Mother harbored in her attempt to run an in-home animal rescue. *Id*. at 13-16, 53. Throughout the case, Ms. Steininger and FICS staff conducted unannounced lifestyle checks, where they observed piles of animal feces and puddles of urine throughout the home, the floor covered by trash, and excessive dirty dishes. *Id*. Ms. Steininger observed these types of conditions less than a week before the hearing. *Id*.

Mother testified at the hearing that she currently had one dog, five cats, one guinea pig, and one parakeet. *Id*. at 101. She acknowledged the number

---

[5] Mother testified that Maternal Grandmother did not harm her, but that she had flashbacks due to her post-traumatic stress disorder of times in the past when Maternal Grandmother had hurt her. N.T., 10/4/21, at 110.

of pets she has is unsafe for S.K., Jr. and that she once admitted to an FICS worker that she would not be able to put S.K., Jr. down on the floor of her home. *Id*. at 113, 117. Although Mother denied that having animals was more important to her than trying to obtain custody of S.K., Jr., she has not reduced the number of animals in her home or remedied the negative impact on the condition of her home from housing so many animals because she is "very picky" about who she trusts to take them. *Id*. at 117-19.

Another ongoing concern is Mother's management of her finances. Mother struggles with impulsive spending and budgeting, and frequently gives her money to others. *Id*. at 10-12, 47. She often depleted her monthly income within a week, and although she should have had enough money to cover expenses, she was unable to explain where she spent it. *Id*.

Mother's mental health has also been a significant factor in her struggles. She suffers from bipolar disorder, paranoid schizophrenia, schizoaffective disorder, and anxiety. *Id*. at 17, 119. She is prescribed multiple medications for her mental health, but she does not always take them as prescribed. *Id*. at 16-17, 22, 48, 55. Mother attends mental health treatment, but occasionally does not show up for her appointments. *Id*. at 18-19, 48. She was hospitalized due to her mental health from April 30 to May 4, 2021, and went to the emergency room for depression in July 2021. *Id*. at 18.

During declines in her mental health, Mother frequently injures herself and goes to the hospital. *Id*. at 19. She went to the emergency room nine times in July 2020, twice in August 2020, six times in November 2020, and once in February 2021.[6] *Id*. at 20-21. Mother's explanation of why she went to the emergency room often does not match the reason documented in her medical records. *Id*. For example, Mother reported having a cancerous cyst for one visit, but her medical records for that visit reflected that she had a urinary tract infection. *Id*. at 20.

Significantly, Mother's unstable mental health negatively impacted her parenting of S.K., Jr. *Id*. at 55. She had difficulty reading his cues, neglected to change his diaper at times, rarely implemented suggested developmental and therapeutic activities for S.K., Jr., confined or held S.K., Jr. instead of allowing him to explore and play, and did not understand his developmental needs. *Id*. at 44, 50, 55. Mother attended fifty-two out of seventy-four parenting education sessions offered by FICS. *Id*. at 42. Unfortunately, while she seemed to understand the parenting lessons in the moment, she did not follow through and apply that knowledge at visits with S.K., Jr. *Id*. at 43, 51.

Similarly, Mother participated in eighty-nine of the 105 visits with S.K., Jr., but they remained supervised due to her inability to parent S.K., Jr. safely.

---

[6] During her testimony, Mother estimated that she had been at the emergency room "at least 47 times this year" because she has "a lot of physical health issues going on." N.T., 10/4/21, at 120.

*Id*. at 48. Despite the availability of transportation or her ability to call in, Mother was only present at three out of ten medical appointments for S.K., Jr. *Id*. at 51-52. FICS also offered sixty-one counseling sessions to Mother, of which she attended forty-three. *Id*.

After her extended efforts trying to assist Mother, Ms. Steininger concluded that Mother was unable to meet the needs of S.K., Jr. due to her mental health problems and unstable lifestyle. *Id*. at 46, 55-56. Ms. Steininger did not believe more time and services could help remedy Mother's incapacity. *Id*. at 73-74. Ms. Dobson, the Agency's caseworker, also opined that Mother cannot safely parent S.K., Jr. *Id*. at 25-26. She highlighted Mother's testimony at the permanency review hearing in June 2021, wherein Mother stated she still was not ready for S.K., Jr. to come home. *Id*. at 26.

We appreciate Mother's efforts to improve her situation, but the certified record establishes that her mental health, with its attendant effects upon her housing, parenting, and overall lifestyle, prevents her from providing essential parental care and control for S.K., Jr. Thus, the orphans' court did not err or abuse its discretion in concluding that Mother has an incapacity that renders her unable to parent and which she cannot remedy.

We also discern no abuse of discretion in the court's rejection of Mother's elaborate contingency plans and convoluted support system that enlisted the assistance of Maternal Grandmother and "about 37 people that [she and Father] would trust" to assist with S.K., Jr., including daycare, Maternal

Grandmother's co-worker, and church members. *Id*. at 87, 89 120, 125-26.

Mother testified during the hearing that she "would never be alone with [S.K., Jr.]" in case of a mental health relapse. *Id*. at 87, 89, 125. She also did not trust Father to be alone with S.K., Jr. because of Father's mental health, but thought they could parent together. *Id*. She maintains her reliance upon Father's support on appeal despite the termination of his parental rights. Her plans also place heavy emphasis upon Maternal Grandmother, despite the volatility between them. Certainly, all parents need a support system, but given that Mother struggled to parent S.K., Jr. safely under supervision at visitation, the orphans' court did not abuse its discretion by determining that Mother's plans could not alleviate her incapacity and finding grounds existed to terminate her rights under § 2511(a)(2).

In her second issue, Mother contends there was insufficient evidence proving that termination of her parental rights best served the needs and welfare of S.K., Jr. *See* Mother's brief at 12. She argues that the record lacks "credible, on-point evidence" regarding the status of the parent-child bond and the effect upon S.K., Jr. of severing that bond. *Id*. at 17-18.

As noted *supra*, § 2511(b) requires the orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." ***T.S.M.***, ***supra***, at 628 (citation and

quotation marks omitted). Our Supreme Court has made clear that § 2511(b) requires the orphans' court to consider the nature and status of the bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Parental rights may be terminated notwithstanding the existence of a parent-child bond. *Id*. Courts must examine the effect upon a child of severing the bond, particularly whether termination of parental rights will destroy a "necessary and beneficial relationship" and cause a child to suffer "extreme emotional consequences." *Id.*

"While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa.Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, *supra*, at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children

are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra*, at 268. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

In the instant case, the orphans' court determined that termination of Mother's parental rights served the needs and welfare of S.K., Jr. because his bond with Mother is minimal, Mother has not shown an ability to meet his developmental, physical, and emotional needs, and S.K., Jr. is doing well with his foster family. Orphans' Court Opinion, 10/20/21, at 9.

We discern no abuse of discretion in this conclusion. The certified record demonstrates that S.K., Jr. has never lived with Mother. Contrary to Mother's argument, the orphans' court assessed the status of the parent-child bond as minimal, which is a sound conclusion supported by the record. Their relationship was forged through their approximately once-per-week supervised visitation. As detailed *supra*, during that visitation, Mother struggled to attend to S.K., Jr.'s needs and did not give him the security to roam and explore in her presence. S.K., Jr. has spent most of his life in his kinship foster home, where his foster parents attend to his needs. N.T., 10/4/21, at 31. His foster parents are willing to adopt him, follow

recommendations to meet his therapeutic needs, and facilitate in-home services for him. *Id*. at 32. They love S.K., Jr. and he appears to be attached to them, looks to them to meet his needs, and refers to them as "Mama and Dada." *Id*. at 32, 65. S.K., Jr. is comfortable with them and in their home. *Id*. at 65.

Part of Mother's argument attacks the orphans' court's reliance upon the observations and opinions of social workers who observed her interactions at supervised visits. *See* Mother's brief at 17. However, this argument is not grounded in the law. The law is quite clear that "an orphans' court is not required by statute or precedent to order a formal bonding evaluation by an expert. Indeed, in assessing the parental bond, the orphans' court is permitted to rely upon the observations and evaluations of social workers." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012) (citations omitted), *overruled on other grounds*, *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017).

Mother's remaining argument is equally unconvincing. She maintains that S.K., Jr.'s reference to his foster parents as "Mama" and "Dada" has minimal significance because he also has referred to Mother in the same fashion. She argues "it is reasonable that a young child who has lived the majority of his life with the foster parents would call his foster parents 'mama' and 'dada' irrespective of the strength of the bond the child has with his biological parents." Mother's brief at 17.

However, that is precisely the point. S.K., Jr. has lived with his foster parents for most of his life, where they have had ample opportunity to forge a bond with him and tend to his needs. Mother, on the other hand, has never progressed past weekly supervised visitation. The law recognizes that this type of limited interaction with parents might lead to an attenuated bond all the while the relationship with the foster parents develops into something meaningful and secure for a child. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super. 2008) (holding orphans' court properly protected bond between child and foster mother as opposed to attenuated bond between child and his mother forged during irregular visits). Nothing about the facts of this case or anything in the certified record suggests that S.K., Jr. will suffer extreme emotional consequences upon the severance of his relationship with Mother. The orphans' court properly considered Mother's inability to provide for the safety, security, and stability of S.K., Jr. and determined his needs would be served by terminating Mother's parental rights. *See Interest of L.W.*, *supra*, at 524.

Finally, to the extent Mother argues the needs and welfare of S.K., Jr. would not be impacted by allowing Mother more time due to his young age, *see* Mother's brief at 15-18, 22, her argument lacks support in the record and under the law. First, even Mother conceded that she cannot care for S.K., Jr. alone, prompting the orphans' court to conclude, reasonably, that nothing will change because even "Mother does not believe in her own ability to parent

after [S.K., Jr.] has been in placement for twenty months." Orphans' Court Opinion, 10/20/21, at 3-4. Moreover, the case to which Mother cites, *In re C.L.G.*, 956 A.2d 999 (Pa.Super. 2008) (*en banc*), specifically notes that a court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, *supra*, at 1007 (citation omitted). S.K., Jr. may be young, but with each passing day he has been securing his bond and reliance upon his foster parents. His young age does not eradicate his need to experience the stability and security of knowing who will care for him and where he will reside long into the future. *In re T.S.M.*, *supra*, at 269.

Having found that the orphans' court did not err or abuse its discretion in terminating Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b), we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/01/2022

- 18 -